# EDGAR F. ZELLE, AS TRUSTEE OF WISCONSIN CENTRAL RAILWAY COMPANY, AND OTHERS v. CHICAGO & NORTH WESTERN RAILWAY COMPANY.[1]

July 2, 1954.

No. 36,303.

---

[1]Reported in 65 N. W. (2d) 583.

*Warren Newcome, Gerald F. Fristensky, George H. Henke,* and *Nye F. Morehouse,* for appellant.

*James E. Dorsey, Donald West, Dorsey, Colman, Barker, Scott & Barber,* and *William J. Quinn,* for respondents.

NELSON, JUSTICE.

The present action is for a declaratory judgment that the alternative remedy provided for by the parties in a pooling agreement voluntarily entered into is a valid remedy. It is not an action for specific performance. We may for all necessary purposes herein refer to plaintiffs-respondents as the Wisconsin Central and to defendant-appellant as the North Western. The Wisconsin Central and the North Western have separate lines serving the mines on the Gogebic Iron Range of upper Wisconsin and Michigan, extending from the mines to their separate ore docks at Ashland, Wisconsin, on Lake Superior. The North Western has another line extending from said mines to ore docks at Escanaba, Michigan, on Lake Michigan. The Wisconsin Central has no line running between the mines and Escanaba.

Prior to the year 1934 the ore traffic between the Gogebic Iron Range and Ashland, Wisconsin, was handled separately by each competing railroad without any plan or voluntary agreement be-

tween them with respect to the traffic. But by agreement bearing date March 26, 1934, the Wisconsin Central and the North Western voluntarily entered into a pooling agreement whereby the iron ore tonnage transported from the Gogebic Iron Range to their respective Ashland ore docks was to be pooled and revenues divided with the Wisconsin Central receiving 31 percent and the North Western 69 percent thereof. The agreement further provided for the parties to furnish crews and equipment in accordance with the pool percentages. The labor-schedule agreement entered into between the Wisconsin Central and the North Western and the employees provided that labor was also to be distributed according to the percentages of the pooling agreement. The latter agreement was entered into for a term of 99 years. It contained no cancellation clause, short term or otherwise, except upon default.

The pooling agreement did, however, provide for revision in the event of changed circumstances. Section 4 of the agreement, which provides the method for revision, reads as follows:

"4. This agreement is based upon the assumption that the principal movement of ore from the Range will be to Ashland docks, and only such ore movement is to be pooled and divided, but if at any time ore shall move from the Range to other points in such quantities as to make this agreement inequitable, or if economical and efficient service shall require the use of some different or additional lines of railroad and facilities of the parties, or extensions thereof, and different routing of ore than herein provided, this agreement shall be revised, upon the request of either party hereto, to the extent made necessary by changed conditions. If the parties are unable to agree upon a proper revision, the matter shall be submitted to arbitration as hereinafter provided."

Since any revision of the pooling agreement shall by the terms of § 4 thereof be by submission to arbitration, we must consider § 75 of the agreement which sets up the arbitration machinery or mechanics to be used if and when the parties disagree giving rise to a demand for arbitration. The first sentence of § 75 reads as follows:

"75. Should the North Western and Wisconsin Central disagree

upon any question as to the true construction of any provision in this contract or concerning any violation of any such provision, such question shall be submitted to the arbitrament of three (3) disinterested persons familiar with such business and experienced in railway management."[2]

Section 75 provides that the award in arbitration shall be made in writing after the parties have been heard and that the same, when

[2]"* * * The party demanding such arbitration shall give to the other party written notice of such demand, stating specifically the question to be submitted for decision and nominating a person who has the required qualifications to act as one arbitrator. If at the expiration of thirty (30) days from the receipt of such notice the party receiving it has not notified in writing the party demanding the arbitration of its nomination of a second arbitrator having like qualifications, the party demanding such arbitration may apply, after ten (10) days' written notice to the other party, to any judge of the United States Circuit Court of Appeals, Seventh Circuit, for the appointment of a second arbitrator. Should the party to whom notice of arbitration is given not have appointed such arbitrator before the expiration of said ten-day period, at any time thereafter such second arbitrator shall be appointed by such judge, and shall thereupon be deemed an arbitrator within this section as if appointed by the party to whom such notice was given. The two arbitrators so appointed as aforesaid shall select a third arbitrator, and the three arbitrators so appointed shall constitute a Board of Arbitrators. In the event of the two arbitrators being unable to agree, within ten (10) days after appointment of such second arbitrator, on such third arbitrator, after five (5) days' written notice by either party to the other any judge of said court may appoint such third arbitrator, and when so appointed, such three arbitrators shall constitute the Board as aforesaid.

"The third arbitrator shall have the power to fix the time and place when and at which the arbitration shall proceed, but, in doing so, shall give due consideration to the reasonable convenience of the parties and their witnesses.

"Upon such Board of Arbitration being completed, it shall proceed with reasonable diligence to inquire into the questions at issue as disclosed in such notice, and may take such evidence as it may deem reasonable or as either party may submit, without requiring witnesses to be sworn, and may hear argument of counsel or others. * * *

"Immediately after any award, so approved by the Interstate Commerce Commission if required by law, the North Western and Wisconsin Central

signed by two or more of the arbitrators, shall be final, binding, and conclusive upon the parties, subject to the approval of the Interstate Commerce Commission if required by law; and that if either the North Western or Wisconsin Central shall refuse to perform any award so approved by the Interstate Commerce Commission, the adverse party may enforce the same by apt proceedings in any court of law or equity.

The arrangement constituting the pooling agreement was assented to by all the carriers involved when entered into and thereafter approved by the Interstate Commerce Commission for the term of 99 years. See 201 I. C. C. 13, 14, as to approval under the Interstate Commerce Act, 41 Stat. 480, 49 USCA, § 5(1).

Prior to the year 1934, as far as the record discloses, all of the ore mined on the Gogebic Iron Range moved to the ore docks at Ashland, Wisconsin, except for a small or very limited amount which was moved to the ore docks at Escanaba, Michigan, over the North Western line. It seems quite clear that this fact was recognized in the pooling agreement. Since the year 1950, however, conditions have changed and there has been a heavy movement of ore shipments over the North Western line to its Escanaba ore docks. In the years 1951 and 1952 the Escanaba shipments were 30 percent and 34 percent respectively of the total ore movement from the Gogebic Range, while as of the date the agreement was entered into and prior

---

each shall make such changes in the conduct of its business, or such payments or restitution, as the case may be, as are in and by such award required to be made.

"The books and papers of both or all the parties, so far as they relate to any matter submitted to arbitration, shall be open to the examination of the arbitrators.

"The North Western and Wisconsin Central each shall pay an equal proportion of the fees and expenses thereof and all fees and expenses of its own witnesses and counsel. Until the arbitrators shall make their award upon any question submitted to them, the business to be done and the settlements and payments to be made under the terms of this agreement shall continue to be done and made in the manner and form existing prior to the arising of such question."

thereto such ore movement to Escanaba, Michigan, constituted only a fraction of one percent of the total ore moved.

The Wisconsin Central claims that this unexpected change in the movement of ore since 1950 between Ashland, Wisconsin, and Escanaba, Michigan, has been in such quantities as to make the pooling agreement inequitable. It further contends that if it were not for the agreement the Wisconsin Central would, in all probability, under competitive conditions successfully solicit and transport to Ashland approximately 31 percent of the total movement from the range instead of only 31 percent of the reduced Ashland movement which now amounts to only approximately 21 percent of the total movement. The Wisconsin Central does not assert that there is anything improper in this movement or that the North Western should or could have refused to transport this ore to Escanaba, but it claims that present ore movements make the pooling agreement inequitable and therefore a revision is required under § 4 thereof by voluntary negotiation and if such negotiations are unsuccessful then by arbitration since the parties have been unable to agree upon a proper revision.

It appears that negotiations finally proved unsuccessful and that in March of 1953 the Wisconsin Central demanded arbitration. Subsequent proceedings under the declaratory judgments act brought the matter on for hearing in the district court below. After each party had been heard and each party had moved for an order for summary judgment, the motion of the Wisconsin Central was granted and an order entered declaring the arbitration provisions of the agreement valid and enforceable and further ordering that the parties forthwith proceed to take such action as is required to carry plaintiffs' demand for arbitration through to completion. Judgment was entered pursuant thereto on November 20, 1953. The North Western appeals from the judgment.

It is established beyond dispute that only the ore transported to Ashland, Wisconsin, is pooled and that what the Wisconsin Central seeks is a revision of the Ashland pool because it claims that a very substantial and unprecedented Escanaba ore movement has created

an inequity to its detriment. The Wisconsin Central does not claim a "vested right" or any proprietary right in any Gogebic ore shipment. Its claim is that the pooling agreement was entered into upon the assumption that the principal movement of ore from the Gogebic Range would continue to be to the docks at Ashland and that, because of that fact and because of the 99-year term of the contract and the absence of any cancellation provision except upon default, the parties included in the agreement a provision for its revision if at any time during its 99-year term ore should move to other points in such quantities as to make the agreement inequitable. It is on this contractual provision that the Wisconsin Central relies in making its demand for arbitration. Its position is not based on the claim that the ore movement to Escanaba violates the pooling agreement or that the North Western is not required, as a common carrier, to comply with the shipping directions of the mining companies but upon the claim that these changed conditions have created inequities that were not and could not be foreseen on March 26, 1934, the date of the agreement, and hence the provisions for arbitration were included in and made a part of the contract constituting the pooling arrangement between the parties. It states that it has made its position clear by submitting the question "Whether said agreement should be revised to permit the Wisconsin Central to move to its dock at Ashland 31% of all rail-lake ore moving from the Gogebic Range or to what other extent and in what other manner revision of said agreement is made necessary by such change in conditions." Wisconsin Central concedes that it is for the arbitrators who are to be chosen as provided in the agreement to decide whether and how the pooling agreement shall be revised if the changed conditions call for a revision.

North Western contends that the requirements for arbitration found in § 4 of the agreement are not sufficiently implemented by § 75 because § 75 starts with reference to disagreement over *construction* or *violation* of the agreement and provides for arbitration thereof and the further provisions of § 75 dealing with selection of arbitrators and making of an award and other appropriate arbitra-

tion machinery can apply only to the questions described in the first clause of § 75. It contends that the arbitration demanded by the Wisconsin Central does not involve the question of construction or violation of the contract referred to at the commencement of § 75 and that § 4 is not sufficiently specific so that a sufficient or proper basis for the revision of the agreement by arbitration exists on the ground that the contract has become inequitable. To be more specific, North Western contends that there was in the pooling agreement a failure to express material and essential terms of revision as well as to prescribe any rule or standard to guide and limit arbitrators in revising the contract. It contends that to be valid and enforceable as a part of this contract this clause must prescribe a formula or outline or give some reasonably definite directions as to the terms of the proposed revision, and that due to the failure to provide the necessary framework for revision, the clause is ineffective as a valid and enforceable revision agreement.

North Western maintains that the Minnesota arbitration act, M. S. A. c. 572, cannot be utilized in this proceeding for the reason that only controversies that are the subject of a civil action may be submitted to arbitration under the statute, § 572.01, and that a question not arbitrable in a statutory proceeding cannot have effect as a common-law submission since the statute has not been obeyed.

■ The statute plainly preserves the common-law right of arbitration. If the parties have by their own effective action substituted one at common law it will be given effect. For that reason it must be given effect here. It was held by this court in Park Const. Co. v. Independent School Dist. No. 32, 209 Minn. 182, 296 N. W. 475, 135 A. L. R. 59, that even though the first intention of the parties was to stick to the statute, if later they set up a common-law arbitration, the parties themselves annulled their first agreement for a statutory proceeding. Insofar as Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259, held to the contrary, it was overruled by that decision.

■ Arbitration has been looked upon with favor in this state both in the statutory and decision field. This court has declared that arbitrators constitute private tribunals, deriving their powers

from the parties as manifested by the terms of the submission; that the submission is the commission of the arbitrator; that, while judges are in duty bound to apply the applicable law in deciding cases, arbitrators do not exercise judicial power; that arbitrators derive their power from the parties, which power may include deciding the law as well as the facts, and the parties are bound thereby; and that the arbitrators may do what no other person acting in the capacity of one who judges can or has a right to do, namely, they may intentionally decide contrary to the law and still have their judgment stand. It follows that, if the parties by their agreement direct that a dispute shall be decided in accordance with applicable law, the arbitrators will be bound thereby; if the parties have not insisted that the applicable law shall govern the decision on the facts, the arbitrators may decide the dispute according to their notion of justice without regard to the applicable law.

■ The North Western insists in its argument opposing arbitration that the contract fails to express the essential terms necessary to effect a revision and also fails to prescribe any rules or standards to guide the arbitrators in making an award, citing McKay v. McKay, 187 Minn. 521, 246 N. W. 12, and Lee v. Tysdal, 163 Minn. 355, 203 N. W. 988, as authorities for overruling arbitration here. But those cases involved awards by the arbitrators clearly beyond the scope of the actual matter submitted to them for arbitration and hence are not in point when applied to the present situation, since here we have no awards to consider but only the right to arbitrate and make awards under the terms of the pooling agreement. It is sufficient if the question to be arbitrated is stated with reasonable certainty and can be determined from the four corners of the instrument. Pursuing its argument further, North Western points out that an agreement to revise a contract may not be specifically enforced unless the terms thereof are definite and complete, citing Shepard v. Carpenter, 54 Minn. 153, 55 N. W. 906, and Dial Toaster Corp. v. Waters-Genter Co. 181 Minn. 606, 233 N. W. 870, to support their contention. In those cases, however, this court was concerned with suits for specific performance of an agreement to enter into future

contract terms. We do not have before us an action for specific performance so those cases are not controlling here.

The demands arising from a controversy between the parties which are to be submitted to arbitration must be sufficiently described so as to be identifiable either from the contractual provision or with the aid of parol evidence if that be necessary. It is not necessary that they should be in the same specific form as required in a pleading. The only requirement is that the demands be described sufficiently to be identified. Daniels v. Willis, 7 Minn. 295 (374) ; Heglund v. Allen, 30 Minn. 38, 14 N. W. 57; Putterman v. Schmidt, 209 Wis. 442, 245 N. W. 78; 6 C. J. S., Arbitration and Award, § 20.[3]

The provision constituting the submission agreement may be in general terms without specification or enumeration as to the various items in dispute. Reference to arbitrators of "all matters in dispute" with reference to the subject matter has been held sufficiently certain and comprehensive to support an award. Cracchiolo v. Carlucci, 62 Ariz. 284, 157 P. (2d) 352.

It generally follows that, where the submission is general, parol evidence is admissible in order to remove uncertainty as to what matters are actually in dispute. Davy's Ex'rs v. Faw, 11 U. S. (7 Cranch) 171, 3 L. ed. 305; Cracchiolo v. Carlucci, *supra*.

■ North Western contends that any revision of the pooling agreement by arbitration will violate § 5(1) of the Interstate Commerce Act and that it is therefore justified in ignoring the arbitration provisions of the pooling agreement upon which Wisconsin Central has made its demands. It further contends that any revised pooling arrangements, even though brought about by arbitration, must have the assent of all the parties. Our answer to these contentions is first, that the matter of subsequent approval of the Interstate Commerce

[3]Acme Cut Stone Co. v. New Center Development Corp. 281 Mich. 32, 274 N. W. 700, 112 A. L. R. 865; Cracchiolo v. Carlucci, 62 Ariz. 284, 157 P. (2d) 352; Dore v. Southern Pac. Co. 163 Cal. 182, 124 P. 817; and Northland Greyhound Lines v. Amalgamated Assn. (D. Minn.) 66 F. Supp. 431, give recognition to the rule that a specific provision for arbitrating a revision in a contract similar to or such as contained in § 4 of the pooling agreement here under consideration is valid and will be enforced.

Commission is not before the court in the present controversy and therefore is not a matter for this court to decide; and second, that since the pooling agreement provides by its terms that the award is to be final, binding, and conclusive on all the parties, any arbitration award made within the scope of the arbitrators' authority would in this proceeding, as the court found below, become a part of the contract which was previously assented to in the voluntary execution of the pooling agreement. See, 3 Am. Jur., Arbitration and Award, § 154. We may assume that any award of the arbitrators made pursuant to §§ 4 and 75 of the agreement would become effective only upon approval by the Interstate Commerce Commission under said § 5(1) of the act governing its proceedings. It appears that the Wisconsin Central fully recognizes that this may well be a requirement which will have to be met if awards are made and there is lacking an assent on the part of any party to the pooling agreement. That, however, is not in any manner the concern of this court in the present proceeding. We are concerned only with the interpretation of the arbitration clause as a contractual provision of the pooling agreement and its submission under the declaratory judgments act of this state. We believe the pending action is a proper one for a declaratory judgment.

■ An arbitration award as we see it, if made under the terms of this pooling agreement (providing the arbitrators have not gone outside the agreement), would for all purposes under the arbitration provisions thereof be read into the original agreement and would, as far as this court may determine the matter, then be binding upon the parties to the agreement as fully as though originally specifically included in the agreement.

We cannot ignore, in considering the court's decision below, the fact that in this case the parties to the pooling agreement assented voluntarily to all its terms at the time it was entered into, including the provision for revision by arbitration if necessary due to changed conditions. This constituted an agreement in advance of any revision by arbitration, limited of course to awards made within the scope of the authority of those acting as arbitrators. A clear state-

ment of the law on this point is to be found in 3 Am. Jur., Arbitration and Award, § 154, where it is said:

"It has been authoritatively stated that the entire proceedings of arbitration and award merely constitute a contract between the parties. At the time of the submission they agree to do what shall be awarded; and when the award is made, it is read into the original agreement."

See, also, 3 Am. Jur., Arbitration and Award, § 83; 6 C. J. S., Arbitration and Award, § 80. This court cannot determine how the arbitrators shall revise the agreement should they find that it is subject to revision. The arbitrators must determine what, if any, dispute or disputes exist between the parties. They must also determine whether or not inequities exist under the terms of the pooling agreement due to changed conditions which present arbitrable questions for decision according to the terms of the agreement, and no court would have any jurisdiction therein unless such decision should later present to court review the question of whether the arbitrators acted within the scope of their authority.

If, as was held in Park Const. Co. v. Independent School Dist. No. 32, 209 Minn. 182, 296 N. W. 475, 135 A. L. R. 59, an agreement to arbitrate all differences arising under a contract is valid and not contrary to public policy, then it would seem that we have in the instant case under §§ 4 and 75 a situation where the subject of arbitration is the whole subject matter of the original contract on the question of revision to the extent made necessary by changed conditions when made upon the request of either party thereto. We must look at the contract as a whole if a reasonable construction is to be reached as to the effect of its terms. This court has said that it is only necessary that the subject of arbitration be described sufficiently to be identified and that where the parties have by their agreement made the arbitrators judges between them of the law and the fact, they are bound by the decision if fairly and honestly made, even though the arbitrators have erred in their conclusions of fact or in the law which they have applied to them. See, Goddard v. King,

40 Minn. 164, 167, 41 N. W. 659, 661; Park Const. Co. v. Independent School Dist. No. 32, 216 Minn. 27, 11 N. W. (2d) 649.

"* * * Where no arbitration statute has changed the rule, the authority of arbitrators and umpires is wholly dependent upon the terms and the validity of the agreement of submission; they are bound by, and must conform to, all stipulations therein, * * *." 3 Am. Jur., Arbitration and Award, § 83.

Neither party to this proceeding nor any party to the pooling agreement can very well claim to have been a nonassenting party to the arbitration provisions when these were placed in the pooling agreement. We are not at this time confronted with the question of what to do if there is a nonassenting party to the arbitration award if and when made. That is a matter which must remain for future consideration if an arbitration award is made and that situation presents itself.

It has been suggested by North Western that the union representing the employees of Wisconsin Central and North Western should have been made a party to this action. The rights of the employees are not being adjudicated in this action. No doubt the union may join if it wishes to do so or if either of the parties wish it or demand it.

Section 4 of the agreement provides that the division arrived at in the pooling arrangement was based on the assumption that the principal movement of ore from Gogebic Range would be to the docks at Ashland, Wisconsin. It also provides that if ore is moving from the range to other points in such quantities as to make the agreement inequitable, or for other reasons stated therein, then the agreement shall be revised upon the request of either party to the extent made necessary by changed conditions. This is followed by the statement that if the parties are unable to agree upon a proper revision the matter shall be submitted to binding arbitration. As we see it § 75 provides the necessary arbitration machinery to proceed accordingly.

We here conclude that the pooling agreement by its terms and especially by the terms of §§ 4 and 75 thereof sets up a sufficient

standard for arbitration and that the authority of the arbitrators is limited solely by the terms of the agreement and therefore no more specific standard need be specified, especially since this pooling agreement runs for a term of 99 years and is not subject to cancellation except upon default. Whether or not an inequity exists is for the arbitrators to consider under the terms of the contract and not for this court. The question is: Does the Wisconsin Central have a legitimate demand for arbitration? We conclude that it does, as did the trial court.

We sustain the order of the trial court, and the judgment appealed from is hereby affirmed.

Affirmed.

